UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CALVIN BLYSTRA, individually and as principal stockholder of Micro-Environmental, Inc., a Florida Corporation, | HONORABLE JOSEPH E. IRENAS |
| Plaintiff, | CIVIL ACTION NO. 00-4593 and 01-2271 (JEI) |
| and | |
| JON R. PETTIGREW, DAVE MUILENBERG, MICHAEL E. SKRZYCKI, MAX DOERING, and TOM DYKSTRA, | **OPINION** |
| Plaintiffs, | |
| v. | |
| FIBER TECH GROUP, INC., a Delaware Corporation; CHESAPEAKE SERVICES CORPORATION, a Virginia Corporation; and EDWARD McCULLOCH and THOMAS SOFO, individually and as officers of Chesapeake Services Corporation and the "Micro Set" Division of Fiber Tech Group, Inc., | |
| Defendants. | |

**APPEARANCES:**

BATHGATE, WEGENER & WOLF, P.C.
By: Dominic J. Aprile, Esq.
One Airport Road, P.O. Box 2043
Lakewood, N.J. 08701

DUNCAN, BLUM, & ASSOCIATES
By: David E. Blum, Esq.
1863 Kalorama Road, N.W.
Washington, D.C. 20009
     Counsel for Plaintiffs

MANDELBAUM & SALSBURG
By: Charles S. Lorber, Esq.
155 Prospect Avenue
West Orange, N.J. 07052

HERBERT S. ROSENBLUM, ESQ.
526 King Street, Suite 211
P.O. Box 58
Alexandria, Va. 22313
      Counsel for Defendants Chesapeake Services Corporation and
      Edward McCulloch

THOMAS SOFO, ESQ., *pro se*
3000 Timber Wood Way
Herndon, Va. 20171

ARCHER & GREINER, PC
By: Mark Oberstaedt, Esq.
One Centennial Square
PO Box 3000
Haddonfield, N.J. 08033
      Counsel for Fiber Tech Group, Inc.


**IRENAS**, Senior District Judge:

      On September 18, 2000, Plaintiff Calvin Blystra ("Blystra")

filed suit against Defendants Fiber Tech Group, Inc. ("Fiber

Tech"), Chesapeake Services Corporation ("Chesapeake"), and

Edward McCulloch ("McCulloch") and Thomas Sofo ("Sofo"),

individually and as officers of Chesapeake.  The complaint

("Blystra Complaint") contained twelve counts: Counts One and Two

assert breach of contract and breach of good faith and fair

dealing against Chesapeake only; Counts Three and Twelve assert

misrepresentations of fact and libel / slander against

Chesapeake, McCulloch, and Sofo; Counts Four through Ten assert,

respectively, claims for unfair and deceptive trade practices,

2

tortious interference, theft / misappropriation / conversion of trade secrets and other property, conspiracy under the federal civil RICO statute, aiding and abetting, unjust enrichment and fraud against all Defendants; and lastly, Count Eleven asserts breach of fiduciary duty against Sofo.  All counts arise out of a series of transactions that Blystra alleges constituted "fraudulent schemes" by Defendants to deprive him of his ownership interests in certain technology that he developed. Blystra seeks damages and equitable relief on all counts.

Eight months after Blystra filed his complaint, on May 11, 2001, the limited partners of Micro-Environmental, L.P.[1] (the "Limited Partners" or "Pettigrew Plaintiffs"), filed a ten count complaint ("Pettigrew Complaint") against the same Defendants arising out of the same set of facts (alleged in the Blystra Complaint) and asserting all the same causes of action, except the two contract claims (Blystra Compl. Counts One and Two).  The Limited Partners also seek damages and equitable relief.[2]

Presently before this Court are Defendant Fiber Tech's motions for summary judgment in both the Blystra and Pettigrew

---

[1]  Individually, Jon R. Pettigrew, Dave Muilenberg, Michael E. Skrzycki, Judith Skrzycki, Max Doering and Robert Dykstra.  Robert Dykstra is now deceased.  His brother, Thomas Dykstra represents his interest in this litigation.

[2]  The Court previously ruled on Motions to Dismiss for Lack of Personal Jurisdiction by Sofo, McCulloch, and Chesapeake.  The libel / slander claims in both the Blystra and Pettigrew Complaints were dismissed as to all the defendants but Counts One through Eleven of the Blystra Complaint and Counts One through Nine of the Pettigrew Complaint remain.

3

cases.   Sofo, McCulloch, and Chesapeake have joined Fiber Tech's motions without separately filing their own supporting papers.[1]

I.

Plaintiffs' causes of action arise out of the events leading up to and including the sale of certain products and technology known as the Micro-Set.  Plaintiffs assert that the sale of the Micro-Set to Fiber Tech was the culmination of a years-long series of conspiracies among Defendants to deprive Blystra and the Limited Partners of their ownership and control of Micro-Environmental, Inc. ("Micro"), and the Micro-Set.

Blystra developed a broad set of products in the 1980s, trademarked Micro-Set, which had various uses as fire retardants and for waste removal.  In order to further market and develop the Micro-Set technology, Blystra formed Micro in 1989.  He transferred ownership of the Micro-Set technology to Micro, whose only shareholders at the time were Blystra and his wife. (Plaintiffs' Counterstatement of Material Facts ("PCMF") ¶ 11; Blystra Compl. Ex. D)

Approximately one year later, Blystra invited Sofo to become General Counsel and Secretary of Micro.  Sofo was granted 15% stock ownership in Micro as compensation for his services,

---

[1]   We have subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

4

leaving Blystra and his wife as joint owners of a majority and controlling interest.   (Aprile Verif. Ex. 2)

In January, 1991, Micro entered into a limited partnership with the Pettigrew Plaintiffs named Micro-Environmental LP ("Limited Partnership") in order to finance further marketing and development of the Micro-Set technology.   Pursuant to the partnership agreement,[4] the Limited Partners contributed approximately $337,000 for research, development and marketing of the Micro-Set technology.   Micro, as the general partner, transferred its ownership of the Micro-Set technology to the Limited Partnership.   (See Pettigrew Compl. Ex. B)   The Limited Partnership granted Micro a non-transferrable, non-assignable exclusive license to use the Micro-Set technology.   (Pettigrew Compl. Ex. D)   It is undisputed that the Amended Limited Partnership Agreement provided that Micro and Blystra "contributed" the Micro-Set technology to the Partnership and agreed to take all necessary actions to transfer all the rights to the Limited Partnership, including any patents.   (PCMF ¶ 17)

Thereafter Sofo introduced Blystra to McCulloch and his company Chesapeake.[5]   In an effort to provide financial support, marketing and administration to Micro, McCulloch / Chesapeake

---

[4]   The limited partnership agreement was amended on November 5, 1991. (PCMF ¶ 16)

[5]   The parties do not dispute that Chesapeake is owned or controlled by McCulloch.

proposed the following transactions which were memorialized in
two one-page agreements, both dated September 9, 1992 (the
"September Agreements"): (1) Blystra and Sofo "conveyed" the
"assets of Micro" to Chesapeake's wholly-owned subsidiary in
exchange for 25% of the subsidiary's common stock (split evenly
between Sofo and Blystra); and (2) Micro appointed the
subsidiary[6] as its "exclusive agent" for "marketing the products
and services of Micro" and for representing Micro in "all
contract negotiations pertaining to joint ventures, licenses and
the sale or disposition of the assets of Micro."  Micro further
granted Chesapeake the authority to "represent itself as Micro."
The agreement was limited to a two-year term.  (Blystra Compl.
Ex. E)

   The parties dispute what, if anything, the September
Agreements accomplished with respect to the Micro-Set since the
Micro-Set was owned by the Limited Partnership, which was not a
party to the September Agreements.[7]  The parties agree that "as a

_____

[6]  The wholly-owned subsidiary will be referred to as "Chesapeake" for
the remainder of this opinion.

[7]  The record indicates that Blystra and Sofo, acting on Micro's behalf,
did not actually have any assets to convey.  Blystra testified at his
deposition: "Q: What assets of Micro did you and Sofo transfer to Chesapeake --
A: I am not really sure.   Q: --at that time?  A: Don't laugh. I didn't own
anything.  The limited partners owned it.  I couldn't transfer a damn thing.
Q: Are you sure about that?  A: Yep. . . . Q: At the time you signed [the
September Agreement], what did you understand the assets to be that you were
conveying?  A: I don't really know.  I knew the limited partners had control
over the technology.  I couldn't give that away."  (Blystra 10-8-01 Dep. at
148:23-149:7; 151:5-9)  Blystra further testified that he signed the September
Agreements despite this knowledge because Sofo told him to. (id. at 149:7-9).

6

result of the transaction, Chesapeake took over as General Partner of the Limited Partnership and was recognized as such by the Limited Partners." (PCMF ¶ 23)

In June, 1993, McCulloch, representing Micro, attended a trade show in Atlantic City, New Jersey, where he met Leon Yergin, a Fiber Tech representative. (McCulloch Dep. at 65-66) Mr. Yergin expressed an interest in the Micro-Set products and they agreed to correspond.  (Id.)

After various meetings and communications, Chesapeake and Fiber Tech entered into a letter of intent in February, 2004, contemplating the sale of the Micro-Set technology.  (PCMF ¶¶ 26-27)  On May 1, 1994, Chesapeake sold the Micro-Set to Fiber Tech. The parties vigorously dispute what due diligence Fiber Tech undertook in connection with the sale and whether the due diligence should have uncovered the Limited Partners' ownership of the Micro-Set.

On the same day Fiber Tech and Chesapeake consummated the sale of the Micro-Set, McCulloch and Sofo entered into consulting agreements with Fiber Tech in which they agreed to further market and develop the Micro-Set on Fiber Tech's behalf.  (Aprile Verif. Ex. 12)  Thereafter Fiber Tech established a Micro-Set Division in its New Jersey facilities to market and develop the Micro-Set products.

For its part, the Limited Partnership was essentially

7

passive throughout its existence, except for actions that Blystra took on behalf of the Limited Partnership and various communications Blystra had with limited partners Muilenberg and Skrzycki.  (Pls. Resp. to Interrog. 2; Muilenberg Dep. at 33-38, 112)

By June, 1994, Blystra discovered the Defendants' actions. In a letter dated June 20, 1994, Blystra advised Fiber Tech that it was "being taken advantage of by Mr. Sofo and Mr. McCulloch" and that "neither Ed McCulloch or Tom Sofo or any of their corporations have the right to use any of the technologies or products of Micro Environmental, Inc."  (PCMF at ¶ 43)  On June 24, 1994, Blystra spoke by phone with Dan Fratini of Fiber Tech. Blystra stated he felt "cheated" and "taken advantage of," that the Defendants were "using technology that is not theirs," that "the limited partners were being ignored," and that he would "pursue legal action" for "fraud, slander" and other claims. (Blystra 10-8-01 Dep. at 233-35)

Less than a month later, the Limited Partnership, Chesapeake, and Sofo sued Blystra in Michigan state court, seeking a temporary restraining order against Blystra and others.[8]  They alleged that "Defendant Blystra has attempted to inform the customers of Chesapeake and [the Limited Partnership]

---

[8]  There is no evidence in the record that the Limited Partners knew about the suit.  Chesapeake was acting as the General Partner of the Limited Partnership at the time, and presumably initiated the suit on behalf of the Limited Partnership.

that he, and not Chesapeake and [the Limited Partnership] own the technologies and products which he transferred to the Limited Partnership." (Pettigrew Compl. Ex. E at 4) The Michigan action was dismissed for lack of prosecution a year and a half later.

In September 1, 1995, all of the Limited Partners, except Doering, formally "forfeited" their partnership interests in letters addressed to Sofo (in his role as "Vice President" of "Micro-Environmental, Inc. / Micro-Set, Inc.") and took a tax write-off of their losses. (PCMF ¶ 37; Oberstaedt Verif. Exs. HH-KK) Plaintiffs have testified that McCulloch and Sofo advised the Limited Partners that the Micro-Set products and technology were essentially defunct and that their best hope was to write off their losses. (PCMF ¶ 36)

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*,

794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.

The Defendants seek summary judgment asserting among other things, that all of the Defendants' claims are barred by the applicable statutes of limitations.  The Court will first address the RICO claims as they are governed by federal law, and then turn to the remaining state law claims.

The statute of limitations for civil RICO claims is four years.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987).  The "injury discovery rule" determines when a civil RICO cause of action accrues.  *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004); *Forbes v. Eagleson*, 228 F.3d 471, 484 (3d Cir. 2000).  Under the injury discovery rule the statute of limitations clock starts running when the Plaintiff "knew or should have known" of his injury and the source of his injury.  *Prudential Ins. Co. of Am.*, 359 F.3d at 233.[9]  To defeat summary judgment if Defendants come forward

---

[9] The injury discovery rule is conceptually distinct from equitable tolling based on fraudulent concealment.  "The purpose of the discovery rule is to determine the accrual date of a claim, for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run.  Equitable tolling presumes claim accrual.  Equitable tolling steps in to toll,

with evidence that Plaintiffs' actual injury occurred outside the

limitations period, Plaintiffs then bear the burden of coming

forward with sufficient evidence to demonstrate they neither had

knowledge of the injury nor knowledge of facts which would have

triggered an obligation to investigate further.  *Id.* at 235-36.

If the evidence in the record is such that no reasonable jury

could find that Plaintiffs did not know and should not have known

of their injuries before the expiration of the limitations

period, summary judgment for Defendants is warranted.  *See*

*Liberty Lobby*, 477 U.S. at 248.

> Plaintiffs assert that the Defendants:
>
> conspired between themselves and/or with other
> third parties . . . with the intent, and for the
> purpose of stealing [Plaintiffs'] trade secrets and
> confidential information, defrauding [Plaintiffs],
> intentionally interfering with current and/or
> prospective contractual economically advantageous
> relationships between [Plaintiffs] and others and
> to commit mail fraud, wire fraud, theft, and the
> transport and receipt of stolen goods in violation
> of the RICO Act.

(Blystra Compl. at ¶ 88; Pettigrew Compl. at ¶ 57).  Essentially,

Plaintiffs allege that the Defendants' transaction which

"purported to sell to Fiber Tech all that Micro and the Limited

Partners owned" was really a collective scheme among Defendants

to deprive Plaintiffs of their ownership interests in the Micro-

---

or stop, the running of the statute of limitations in light of established
equitable considerations."  *Forbes*, 228 F.3d at 486 (quoting *Oshiver v. Levin,*
*Fishbein, Sedran & Berman*, 38 F.3d 1380, 1390 (3d Cir. 1994)).  Plaintiffs'
arguments that equitable tolling should apply in this case will be addressed
shortly.

Set technology.   (Pettigrew Opp. Br. at p. 22)

Although the parties dispute how this transaction affected their asserted ownership interests in the Micro-Set technology, no one disputes that the transaction occurred on May 1, 1994, so that actual injury to Plaintiffs occurred on the same day, well outside the limitations period.

### A.

The undisputed evidence demonstrates that Blystra knew, or at least should have known, about the transaction with Fiber Tech in June, 1994.  Blystra does not absolutely deny that he knew about the transaction by June, 1994.  Rather he contends he was "without specific knowledge of the relationship existing between [Defendants] and Fiber Tech."  (PCMF ¶ 42).  However, even accepting Blystra's statement as true, the undisputed facts demonstrate that Blystra had knowledge of facts which put him on inquiry notice of the transaction.  *See Prudential Ins. Co. of Am.*, 359 F.3d at 235-36 (finding Plaintiff knew of facts which should have provided it "inquiry notice" and holding Plaintiff should have known of its injuries); *Hauptmann v. Wilentz*, 570 F. Supp. 351, 399 (D.N.J. 1983) ("For statute of limitations purposes, a plaintiff does not need to be aware of the full extent of a conspiracy, or fraudulent scheme, or of all the details that would be necessary to establish that one existed.

The statute of limitations begins to run when plaintiff is aware
of facts that put her on notice of the conspiracy or general
fraudulent scheme.").

Blystra testified that in June, 1994, he "notified" Fiber
Tech by telephone that "Mr. McCulloch and Mr. Sofo did not have
the rights to sell the [Micro-Set] products or technology."
(Blystra 12-11-01 Dep. at 55)  On June 20, 1994, Blystra wrote a
letter to Fiber Tech stating that Fiber Tech was "being taken
advantage of by Mr. Sofo and Mr. McCulloch" and that "neither Ed
McCulloch or Tom Sofo or any of their corporations have the right
to use any of the technologies or products of Micro
Environmental, Inc."  (PCMF at ¶ 43)  Most notably, at his
deposition Blystra authenticated the notes Daniel Fratini,
Marketing Manager for Fiber Tech, made during a June 24, 1994,
telephone conversation between Fratini and Blystra: "[Blystra]
feels he was cheated, taken advantage of . . . Pursuing legal
action, lawsuit, slander, fraud and other issues . . . Using
technology that is not theirs, Micro-Set . . . Other limited
partners in Micro-Environmental are being ignored."  (Blystra 10-
8-01 Dep. at 233-35)

Thus, by June 24, 1994, at the latest, Blystra was
sufficiently aware of the facts and circumstances to identify
that (a) he had been injured and (b) the injury arose out of
actions taken by the Defendants with respect to the ownership of

13

the Micro-Set technology.   This knowledge is sufficient to impose

on him the duty to further investigate whether or not Fiber Tech

had actually completed a transaction involving the Micro-Set

technology and if so, the specific terms of the transaction.   *See*

*Forbes*, 228 F.3d at 486 ("Plaintiffs were aware, or should have

been aware, of the injury which they allege . . . and the source

of the injury . . . under an injury discovery rule, nothing more

was required to trigger the running of the four-year limitations

period.").   Therefore the Court holds that the accrual date for

Blystra's claims was June 24, 2003.

Because Blystra's claim accrued in June 24, 1994, but he did

not file his Complaint until September 18, 2000, his civil RICO

claim is time-barred unless equity requires tolling.   *See Klehr*

*v. A.O. Smith Corp.*, 521 U.S. 179, 193-95 (the fraudulent

concealment doctrine equitably tolls civil RICO statute of

limitations only when plaintiffs exercise reasonable diligence to

discover their claim).   Blystra has the burden of proving

fraudulent concealment:

> When plaintiffs seek to demonstrate a case for
> equitable tolling, and defendants seek summary
> judgment on the issue, a court must determine (1)
> whether there is sufficient evidence to support a
> finding that defendants engaged in affirmative acts
> of concealment designed to mislead the plaintiffs
> regarding the facts supporting their claim, (2)
> whether there is sufficient evidence to support a
> finding that plaintiffs exercised reasonable
> diligence, and (3) whether there is sufficient
> evidence to support a finding that plaintiffs were
> not aware, nor should they have been aware of the

facts supporting their claim until a time within
the limitations period measured backwards from when
plaintiffs filed their complaint.  Absent these
findings there is no genuine issue of material fact
on the issue and defendants are entitled to summary
judgment.

*Forbes*, 228 F.3d at 486-87; *accord Prudential Ins. Co. of Am.*,
359 F.3d at 238 (quoting *Forbes*).

Assuming *arguendo* that Defendants engaged in affirmative

acts of concealment, Blystra's tolling argument still fails.  He

cannot establish that he was not or should not have been aware of

the facts supporting his claim.  As discussed above, Blystra was

aware of many of the facts supporting his claims by June 24,

1994.  The same undisputed evidence that put Blystra on inquiry

notice of his injuries precludes tolling on fraudulent

concealment grounds.

To the extent that Blystra seeks equitable relief, the Court

also holds that his RICO claim is barred by the doctrine of

laches.  "Once the statute of limitations has expired, the

defendant 'enjoys the benefit of a presumption of inexcusable

delay and prejudice.'" *Santana Prods., Inc. v. Bobrick Washroom

Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (quoting *EEOC v.

A&P*, 735 F.2d 69, 80 (3d Cir. 1984)).  Thus, the burden lies with

Blystra to prove that his delay in filing this present suit was

excusable and the delay did not prejudice the Defendants.  *Id.* at

138-39.  Blystra cannot establish excusable delay for the same

reasons he has not established equitable tolling.  His civil RICO

15

claim (Blystra Compl. Count Seven) is therefore time-barred and barred by the doctrine of laches and will be dismissed.

B.

In contrast to the ample evidence of Blystra's knowledge, the record is sparse regarding the Limited Partners' knowledge.[10] Blystra on one hand, was involved with Sofo and McCulloch / Chesapeake from the beginning.  Blystra was a party to the September Agreements and was actively involved with Chesapeake. Blystra invited Sofo to become involved with Micro.  Not only was Blystra a defendant in the Michigan litigation, he counterclaimed against Sofo and Chesapeake.  Throughout all of the relevant time period Blystra was at the direct center of the initial transactions and subsequent disputes which give rise to this litigation.

There is no evidence that the Limited Partners were contemporaneously aware of the September Agreements or Blystra's subsequent concerns about the effect the agreements had on their rights to the Micro-Set.  By the end of 1994, the Limited Partners were only aware that the relationships between Blystra, Sofo and McCulloch had severely deteriorated.  The Limited

---

[10]   Defendants treat Blystra's knowledge as the Limited Partners' knowledge.  Specifically, Defendants point to the Limited Partners' response to Interrogatory 17 where they indicate that Blystra acted "on their behalf" when he advised Dan Fratini of the Limited Partners' rights in the Micro-Set. The Court is not persuaded that Blystra's knowledge can be imputed to the Limited Partners on this basis.

16

Partners became "frustrated" with the conflicting information
they were receiving from Blystra on one hand, and McCulloch and
Sofo on the other, and did not know who to believe.  (Skrzycki
Dep. at 71; see also Muilenberg Dep. at 33-38)    Then on
September 1, 1995, all the Limited Partners, except Doering,
forfeited their partnership interests which they allege was part
of the fraudulent scheme itself.

     This evidence alone is insufficient to establish when the
Limited Partners discovered or should have discovered their
injuries.  A reasonable jury might find on this record that the
Limited Partners did not actually know and should not have known
of their injuries until sometime within the four years preceding
the date their Complaint was filed (May 11, 2001).  Therefore the
Court must deny summary judgment on statute of limitations
grounds with respect to their RICO claim (Pettigrew Compl. Count
Five).

                              IV.

     Plaintiffs' various state law claims for misrepresentations
of fact, unfair and deceptive trade practices, tortious
interference, theft / misappropriation / conversion of trade
secrets, aiding and abetting, fraud, unjust enrichment and breach
of fiduciary duty, as well as Blystra's contract claims, all
arise out of actions allegedly taken by Defendants as part of
their conspiracy to deprive Plaintiffs of their rights in the

                              17

Micro-Set technology, and thus, the above discussion of the RICO claims is instructive in analyzing these counts.

Like federal law, New Jersey law employs an injury discovery rule for accrual of these types of claims.[11]  *See County of Morris v. Fauver*, 153 N.J. 80, 109 (1998) ("The discovery rule provides that in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action."); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) ("When the gist of the action is fraud concealed from the plaintiff, the statute begins to run on discovery of the wrong or of facts that should lead the plaintiff to inquire into the fraud.") (citing N.J. Stat. Ann. 2A:14-1 and *Lopez v. Swyer*, 62 N.J. 267 (1973));  *New West Urban Renewal Co. v. Viacom, Inc.*, 230 F. Supp. 2d 568, 572 (D.N.J. 2002).

---

[11]  The Court recognizes that in a quasi-contract action for unjust enrichment New Jersey courts employ a "last rendition of services" test, rather than an injury discovery rule, to determine claim accrual.  *See Baer v. Chase*, 392 F.3d 609, 622 (3d Cir. 2004) (citing *Rabinowitz v. Mass Bounding & Ins. Co.*, 119 N.J.L. 552, 557 (1938)).  However, the Plaintiffs' claims in this suit are based on a tort theory, not a quasi-contract theory.  "The Restatement of Torts does not recognize unjust enrichment as an independent tort cause of action. . . . the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion."  *Castro v. NYT Television*, 370 N.J. Super. 282, 299 (App. Div. 2004); *see also Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 936-37 (recognizing a conceptual distinction between quasi contract and tort theories and observing, "[i]n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim.").  As such, the Court will treat the Plaintiffs' unjust enrichment claim as subsumed by their other tort claims, and not as an independent cause of action.

A.

As held above, Blystra's claims accrued on June 24, 1994. Blystra filed his complaint on September 18, 2000, beyond the six year limit.  N.J. Stat. Ann. § 2A:14-1.

Although New Jersey law recognizes fraudulent concealment as a basis for equitable tolling, it generally tracks the test for tolling of civil RICO claims.  *See Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 828 F. Supp. 287, 300 (D.N.J. 1993), *aff'd,* 359 F.3d 226 (3d Cir. 2004); *Hauptmann v. Wilentz*, 570 F. Supp. 351, 397 (D.N.J. 1983).  Thus for the reasons stated above, Blystra is not entitled to equitable tolling of the statute of limitations. Likewise, Blystra's equitable claims are also barred by laches.[12] His claims for misrepresentations of fact, unfair and deceptive trade practices, tortious interference, theft / misappropriation / conversion of trade secrets, aiding and abetting, fraud, and breach of fiduciary duty, as well as his contract claims, will be dismissed as time-barred and barred by the doctrine of laches.

B.

Regarding the Limited Partners' claims, as explained above,

---

[12]  *See Lavin v. Bd. of Ed.*, 90 N.J. 145, 152-53 & 153 n.1 (1982) ("Long lapse of time, if unexplained, may create or justify a presumption against the existence or validity of plaintiff's right and in favor of the adverse right of the defendant . . . or that the adverse party would be prejudiced by the enforcement of plaintiff's claim. . . . Where a legal and equitable remedy exist for the same cause of action, equity will generally follow the limitations statute.")

the Court is unable to determine on the present record when the Limited Partners knew or should have known of their injuries giving rise to their misrepresentations of fact, unfair and deceptive trade practices, tortious interference, theft / misappropriation / conversion of trade secrets, aiding and abetting, fraud, and breach of fiduciary duty.  Accordingly, summary judgment on the Limited Partners' claims is inappropriate at this time.

### V.

Because we hold that Defendants' motion for summary judgment in the Pettigrew case cannot be granted on the statute of limitations issue, the Court must address Defendants' other arguments for dismissal.  First, all Defendants assert that the Limited Partners lack standing because they were not injured by the allegedly wrongful transfer of the Micro-Set technology. Because the Limited Partnership, not the individual partners, owned the Micro-Set, Defendants argue that the suit should have been filed as a derivative action.  Second, Fiber Tech argues that it did not owe a duty of due diligence to the Limited Partners.  The Court rejects both of these arguments.

### A.

The Limited Partners as individuals have standing.

20

Plaintiffs assert that Defendants conspired to deprive the

Limited Partnership of the Micro-Set technology.   Though the

Court does not decide the merits of this claim, if the Limited

Partners' theory is correct, they are the only people who

actually suffered measurable harm as a result of the wrongful

conduct.

Delaware[13] courts have observed:

[a]pplication of corporate law rules to disputes
related to a limited partnership necessitates a bit of
flexibility. . . . 'In the partnership context, the
relationships among the parties may be so simple and
the circumstances so clear-cut that the distinction
between direct and derivative claims becomes
irrelevant.'  Similarly, in some instances, the
relationships among the parties and the function and
structure of the partnership itself may diverge from
the corporate model so dramatically that some claims,
which in a corporate context might be classified as
derivative, must be brought as direct claims in order
to enable the injured parties to recover while
preventing a windfall to individuals or entities whose
interests were not injured.

*Anglo Am. Sec. Fund, L.P. v. S.R. Global Grace Trust 1487*, 829

A.2d 143, 150-51 (Del. Ch. 2003) (quoting *In re Cencom Cable*

*Income Partners L.P. Litig.*, No. 14634, 2000 Del. Ch. LEXIS 10 at

*8 9 (Del. Ch. Jan. 27, 2000)).

This case arises out of relationships and transactions

---

[13]   The parties do not address the choice of law issue in their papers.
Delaware law applies to determine whether the Limited Partners have standing.
*Seidel v. Lee*, No. 93-494, 1994 U.S. Dist. 21534 at *15 16 (D. Del. Oct. 14,
1994) (where limited partnership is organized under the laws of Delaware,
Delaware law controls the determination of whether a limited partner's suit is
individual or derivative).

between *individuals* who merely used the Limited Partnership as a vehicle to advance their own personal business.  Micro's sole shareholders were Blystra, his wife and Sofo.  Blystra conducted the Limited Partnership's business while the Limited Partners mainly saw their roles as passive investors in the Micro-Set technology. (Muilenberg Dep. at 38, 112)  Unlike shareholders of a corporation, tight restrictions were placed on the Limited Partners' transfer of their partnership interests.  (See Pettigrew Compl. Ex. C)  In short, the Limited Partnership "dramatically diverged from the corporate model."  *Anglo Am. Sec. Fund*, 829 A.2d at 151.

Moreover, a direct claim is the only way the Limited Partners, if successful in proving their case, can be compensated because the Limited Partnership is essentially defunct and all but one of the Limited Partners forfeited their interests in the Limited Partnership.[14]  Micro, the general partner, is also

---

[14]  Although mindful of the Third Circuit's recent decision in *United States v. Acorn Technology Fund, L.P.*, No. 04 3663, 2005 WL 2979230 at *6-7 (3d Cir. Nov. 8, 2005), the Court concludes that the Limited Partners' claims need not be asserted derivatively.  The Revised Uniform Limited Partnership Act (RULPA) adopted in both New Jersey and Delaware, recognizes the availability of a derivative action but does not mandate that a suit such as this be brought exclusively as a derivative action.  *See* Del. Code Ann. tit. 6, § 17-1001 ("A limited partner . . . *may* bring an action . . . in the right of a limited partnership") (emphasis added).  Although the Third Circuit decided that the investors' claims in *Acorn Technology* must be brought derivatively, we cannot interpret the case to hold that derivative claims are the exclusive vehicle available to limited partners.  Judge Frank Van Antwerpen did not discuss the issue, nor did he cite any authority for that proposition.

In this case, the General Partner, upon whom demand would be made in a derivative suit, is Micro, a defunct entity.  Plaintiffs also allege that Micro was effectively hijacked by Chesapeake, a defendant here.  Thus, even though the Pettigrew Complaint does not allege demand futility the record is

inactive.  *See, e.g., Gunter v. Ridgewood Energy Corp.*, 32 F.
Supp. 2d 166, 175 (D.N.J. 1998) (plaintiffs, as investors in
limited partnerships, had standing to challenge sale of
partnerships' assets where partnerships were liquidated and
dissolved after the sale).


                                B.

     Fiber Tech also argues that it owed no duty of due diligence
to the Limited Partners; therefore it cannot be liable to them on
any of their claims.  The Court rejects this argument as well.
The Limited Partners allege that Fiber Tech, along with the other
Defendants, committed intentional business torts against them.
As such, Fiber Tech had a duty to avoid committing those torts
against the Limited Partners.  *See Emerson Radio Corp. v. Orion
Sales, Inc.*, No. 95 6455, 2000 U.S. Dist. LEXIS 487 at *23
(D.N.J. Jan. 10, 2000) ("Unfair competition, like fraud, is an
intentional tort and every person is under a duty not to commit
intentional torts."); *see also* Restatement (Second) of Torts § 4
cmt. b ("The word 'duty' is used most frequently in that part of

---

replete with evidence that demand on the General Partner-- either Micro or
Chesapeake-- would have been futile.  Moreover, allowing the individual claims
to proceed in this case does not run the risk of inconsistent results because
all the limited partners and Blystra, who purports to act on Micro's behalf,
are plaintiffs in this action.  All parties who have a stake in the outcome of
this litigation are represented here.  To the extent the Limited Partners'
claims may be affected by the forfeitures of their individual partnership
interests, the Court can appropriately address that issue separately should
liability be found.

                                23

the Restatement . . . which deals with the subject of negligence. . . . 'Duty' is rarely used in dealing with the invasions of legally protected interests by acts which are intended to invade them.")  Whether Fiber Tech breached its duty is a question that cannot be answered at this stage because disputed facts exist as to the nature of Fiber Tech's relationship with the other Defendants.[15]  Thus, summary judgment for Defendants will be denied.

IV.

For the reasons set forth above, the Court will grant Defendants' Motion for Summary Judgment with respect to the Blystra Complaint.  The Court will deny Defendants' Motion for Summary Judgment with respect to the Pettigrew Complaint.  An appropriate order will be issued.

Dated: December 29, 2005

_____
**JOSEPH E. IRENAS, S.U.S.D.J.**

---

[15]  Specifically, issues of disputed fact exist as to whether Fiber Tech was a co-conspirator, an aider / abettor, and / or a principal of Sofo, McCulloch and Chesapeake.  For this reason, the Court also rejects the Defendants' arguments regarding the merits of the Limited Partners' claims for unfair trade practices, misappropriation of trade secrets, tortious interference, conspiracy, aiding and abetting, and fraud.  With regard to Defendants' unjust enrichment argument, as stated above, the Court considers the unjust enrichment claim to be subsumed by the other tort claims.

24